[982 NE2d 595, 958 NYS2d 675]

MARLINO GRESS et al., on Behalf of Themselves and All Other Similarly Situated Persons, Respondents, v BYRON BROWN, as Mayor, City of Buffalo, et al., Respondents, and BUFFALO FISCAL STABILITY AUTHORITY, Appellant.

Argued October 17, 2012; decided December 13, 2012

### APPEARANCES OF COUNSEL

*Harris Beach PLLC*, Pittsford (*A. Vincent Buzard* and *John A. Mancuso* of counsel), for appellant.

*Lipsitz Green Scime Cambria LLP*, Buffalo (*John M. Lichtenthal* of counsel), for Marlino Gress and others, respondents.

*Timothy A. Ball, Corporation Counsel*, Buffalo (*David M. Lee* of counsel), for Byron Brown and another, respondents.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Edward F.X. Hart* and *Leonard Koerner* of counsel), for City of New York, amicus curiae.

### OPINION OF THE COURT

MEMORANDUM.

The order of the Appellate Division, insofar as appealed from, should be reversed, with costs, the declaration that the Buffalo Fiscal Stability Authority (the BFSA) does not have the authority to freeze the wages of plaintiffs vacated, and plaintiffs' complaint as against defendant BFSA dismissed.

In 2003, the legislature enacted the Buffalo Fiscal Stability Authority Act (the Act), declaring "that the city of Buffalo is facing a severe fiscal crisis, and that the crisis cannot be resolved absent assistance from the state" (Public Authorities Law § 3850-a); and determining that the City's untenable reliance on "annual extraordinary increases in state aid to balance its budget" presented a grave issue of "overriding state concern . . . requiring the legislature to intervene" (*id.*). To that end, the legislature created the BFSA, a public benefit corporation empowered to control and freeze municipal-employee wages that were set "pursuant to collective bargaining agreements, other analogous contracts or interest arbitration awards" (*id.* § 3858 [2] [c] [i]). On April 21, 2004, the BFSA adopted Resolution No. 04-35 (available at http://www.bfsa.state.ny.us/ meetings2004/resolutions/res0435.pdf), which directed that "effective immediately, there shall be a freeze with respect to all wages, wage rates, and salary amounts for all employees of the

City and all Non-exempt Covered Organizations, to the full extent authorized by the Act." This wage freeze was meant "to prevent and prohibit *any* increase in wage rates, wages or salaries for *any* employee of the City or a Non-exempt Covered Organization" (emphases added).*

Plaintiffs, who are at-will, seasonal employees of the City's Public Works Department, commenced this class action against the City and its Mayor in January 2008. Plaintiffs alleged that the City violated Buffalo's Living Wage Ordinance (City of Buffalo Code § 96-19) by failing to pay them scheduled wage increases; they asked for injunctive relief and retroactive pay. After the City and Mayor interposed the wage freeze resolution as an affirmative defense, plaintiffs amended their complaint to include the BFSA as a defendant and to seek a declaration that the "Buffalo Fiscal Stability [Authority] Act does not authorize or empower [the BFSA] to freeze or control wages of [p]laintiffs and the class."

Plaintiffs moved for partial summary judgment against the BFSA, and the BFSA cross-moved for summary judgment, asserting that plaintiffs' claim against it was time-barred because the declaratory relief requested was in substance an administrative challenge subject to CPLR article 78's four-month limitations period. Supreme Court rejected the BFSA's statute-of-limitations defense, and issued the declaration sought by plaintiffs. The Appellate Division affirmed (82 AD3d 1654 [4th Dept 2011]), and we granted leave to appeal (17 NY3d 714 [2011]).

In *Solnick v Whalen* (49 NY2d 224 [1980]), we established that the statute of limitations in an action for a declaratory judgment is determined "by reference to the gravamen of the claim or the status of the defendant party" (*id.* at 229). If a declaratory judgment action could have been commenced by an alternative proceeding "for which a specific limitation period is statutorily provided, then that period" applies instead of CPLR 213 (1)'s six-year catchall provision (*id.* at 230). As a result, we must "examine the substance of [the] action to identify the relationship out of which the claim arises and the relief [is] sought" (*id.* at 229).

Here, plaintiffs dispute the BFSA's decision to suspend their scheduled wage increases. They do not quarrel with the wage

---

* The wage freeze remained in effect until July 1, 2007, when the BFSA lifted it (*see* Buffalo Fiscal Stability Authority Resolution No. 07-21, available at http://www.bfsa.state.ny.us/meetings2007/resolutions/res07021.pdf).

freeze generally; rather, they contest its application to them through the BFSA's administrative action. Such a challenge should have been raised by commencing a CPLR article 78 proceeding within four months after the BFSA's adoption of Resolution No. 04-35 (see *Solnick*, 49 NY2d at 232 ["an *ad hoc* determination of an individual party's right of reimbursement (is) a determination more accurately classified as administrative rather than legislative"]). The dissent counters that the BFSA, in fact, "had no authority to freeze the wages due plaintiffs pursuant to the Living Wage Ordinance" (dissenting op at 962). But whether or not authorized to do so, the BFSA froze plaintiffs' wages and once this happened, the City and Mayor were bound by its action.

Chief Judge LIPPMAN (dissenting). It is evident that, as Supreme Court and the Appellate Division (82 AD3d 1654, 1655-1656 [4th Dept 2011]) held, defendant Buffalo Fiscal Stability Authority (BFSA) had no power to freeze plaintiffs' wages. The BFSA's enabling statute, Public Authorities Law, article 10-D, title 2 (§ 3850 *et seq.*), authorizes the Authority to suspend scheduled salary or wage increases of city employees where those increases would otherwise take effect "pursuant to collective bargaining agreements, other analogous contracts or interest arbitration awards, now in existence or hereafter entered into" (Public Authorities Law § 3858 [2] [c] [i]). There is no dispute that those in the plaintiff class are not compensated pursuant to a collective bargaining agreement or interest arbitration award, and the expert affidavit of Cornell Professor Risa L. Lieberwitz duly credited by Supreme Court demonstrates that the terms of plaintiffs' employment are in no way analogous to those of other municipal employees negotiated in collective bargaining; plaintiffs' compensation is governed instead exclusively by the schedule unilaterally set by the City in section 96-19 of its municipal Code, otherwise referred to as the Living Wage Ordinance.

In construing a wage freeze provision remarkably similar to the BFSA resolution relied upon by the present defendants, we held in *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York* (41 NY2d 205 [1976])[1] that judicially mandated salary

---

**1.** The provision there at issue read, "Increases in salary or wages of employees of the city . . . which have taken effect since June thirtieth, nineteen hundred seventy-five or which will take effect after that date *pursuant to collective bargaining agreements or other analogous contracts,* now in existence

increases were exempt from the freeze there at issue. In so holding, we were guided by the familiar principle that "where . . . the statute describes the particular situations in which it is to apply, 'an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded' (McKinney's Cons Laws of NY, Book 1, Statutes, § 240)" (*id.* at 208-209). Application of the same rule of construction to the provision here at issue leads inexorably to the conclusion that the legislature did not intend to authorize a freeze of the wages of municipal employees such as plaintiffs, whose rate of compensation was not the product of collective bargaining or an analogous contract, or of interest arbitration.

Nor should it be hard to understand why the legislature would have exempted from the contemplated wage freeze employees who, even with scheduled wage increases, would earn no more than what the City itself had determined to be the bare minimum living wage. Indeed, it is apparent from the face of the Living Wage Ordinance that in enacting it the City made a considered judgment that, even at a time of acknowledged financial crisis (*see* City of Buffalo Code § 96-19 [A] [8]), paying City employees an hourly wage that would minimally suffice for a family of three to live at or just above the federal poverty level, would ultimately inure to the City's economic advantage. The Ordinance in its statement of intent observes that "[t]he use of taxpayer dollars to promote sustenance and create family-supporting jobs will increase consumer income while decreasing levels of poverty" (City of Buffalo Code § 96-19 [A] [5]), and that "living-wage legislation may benefit the larger community by reducing reliance on taxpayer-funded public assistance such as food stamps, Medicaid, emergency medical services and other social programs provided by the Erie County government" (City of Buffalo Code § 96-19 [A] [6]). Given these purposes, there is no reason to believe that the legislature's failure to authorize a BFSA freeze of the wages of workers whose rate of compensation was governed solely by the Living Wage Ordinance was attributable to some oversight; it would not be reasonable to suppose that the legislature intended to empower the BFSA to interfere with a very modest municipal compensation scheme that, in the City's estimation, would, by sustaining the livelihood of covered employees such as plaintiffs at or slightly above the federal poverty line, ultimately inure to the fiscal benefit of Buffalo and Erie County.

or hereinafter entered into . . . are hereby suspended" (*Patrolmen's Benevolent Assn.*, 41 NY2d at 208 [emphasis added]).

Inasmuch as the BFSA had no authority to freeze the wages due plaintiffs pursuant to the Living Wage Ordinance, it is difficult to see how an action such as this one, seeking enforcement of the right to be compensated in accordance with the Ordinance, can be understood as a challenge to the April 2004 BFSA wage freeze resolution upon which defendants now rely. Indeed, it is only by construing the resolution as an ultra vires exercise—one purporting to bind plaintiffs even in the absence of authority to do so—that the resolution may be said to bear upon plaintiffs' claims at all. But the subject BFSA resolution, assertedly, reaches only as far as the Authority's enabling legislation permits,[2] which, as noted, is not so far as to affect plaintiffs' entitlement to be paid in accordance with the Living Wage Ordinance.

Nor does there seem to be any basis for defendants' contention that plaintiffs should have known that the BFSA resolution was binding upon them because their rate of pay was consequently frozen. There is, in fact, no discernible relation between the alleged failure by the City to pay plaintiffs at the pay rate mandated by the Living Wage Ordinance and the 2004 BFSA resolution. Plaintiffs allege that they have not been paid at the rate to which they were entitled since 2002—fully two years prior to the BFSA wage freeze resolution. Defendants, on the other hand, allege that plaintiffs were actually paid in excess of the wages required by the Ordinance.[3] Under either scenario there would have been no clearly perceptible relationship between the issuance of the BFSA wage freeze and plaintiffs' rate of pay. There is when all is said and done no indication that the Authority's 2004 wage freeze was intended to be, or was in fact, effectual, much less final and binding as to plaintiffs, and, that being the case, it cannot have operated to set the four-month statutory period running as to their claims (*see* CPLR 217 [1]).

This was at its inception and remains in its actual aspect simply an enforcement action of the sort expressly permitted by

**2.** The resolution recites that it is to be effective "to the full extent authorized by the Act," thus recognizing that the BFSA's wage freeze authority under the Public Authorities Law is not boundless (*see* BFSA Resolution No. 04-35, available at http://www.bfsa.state.ny.us/meetings2004/resolutions/res0435.pdf).

**3.** The City contends in this connection that although plaintiffs' stated hourly rate was not the one to which they were entitled, they were paid for hours for which they did not work and, in consequence, received in excess of the compensation to which they would have been entitled for their hours of work.

the Living Wage Ordinance (City of Buffalo Code § 19-96 [F] [1]), and, as such, subject to the special limitations period set forth in the Ordinance running for two years subsequent to the discovery of an alleged violation (*id.*). It should be elementary that defendants' interposition of a time-bar defense based on an irrelevant BFSA resolution logically cannot transform the action's gravamen; the action does not become a challenge to an administrative determination subject to the four-month statutory period set forth in CPLR 217 unless there is a final and binding administrative determination truly implicated by plaintiffs' claims. Here, that condition is not met. And, in its absence, there is no reading of *Solnick v Whalen* (49 NY2d 224 [1980]) that permits, much less requires, the result the majority has reached. Accordingly, I dissent and would affirm the order of the Appellate Division.

Judges GRAFFEO, READ, SMITH and PIGOTT concur; Chief Judge LIPPMAN dissents and votes to affirm in an opinion in which Judge CIPARICK concurs.

Order, insofar as appealed from, reversed, with costs, the declaration that the Buffalo Fiscal Stability Authority does not have the authority to freeze the wages of plaintiffs vacated and plaintiffs' complaint as against defendant Buffalo Fiscal Stability Authority dismissed, in a memorandum.